In re Robert STREHLOW, Jr., Debtor.

Gui GOVAERT, Chapter 7 Trustee and the Federal Deposit Insurance Company, Plaintiffs,

v.

Robert STREHLOW, Jr., Debtor and Judith G. Strehlow, Defendants.

Bankruptcy No. 87–00832–BKC–SMW. Adv. No. 87–0464–A.

United States Bankruptcy Court, S.D. Florida.

March 22, 1988.

Harold D. Moorefield, John C. Shawde, Miami, Fla., for plaintiff, Federal Deposit Ins. Co.

Jerry Markowitz, Markowitz, Davis & Ringel, Miami, Fla., for plaintiff, Gui Govaert, Chapter 7 Trustee.

Geoffrey S. Aaronson, Schantz, Schatzman, Aaronson & Berlin, P.A., Miami, Fla., for defendants, Robert Strehlow, Jr., and Judith G. Strehlow.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS CAUSE came before the Court on January 22, 1988 upon the Complaint to Object to Claimed Exemption and to Avoid Fraudulent Conveyance filed by Plaintiffs, Gui Govaert, Chapter 7 trustee, and the Federal Deposit Insurance Company ("FDIC") against the debtor, Robert Strehlow, Jr. and his wife, Judith E. Strehlow. The Court having heard the testimony and examined the evidence presented, having observed the candor and demeanor of the witnesses and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law.

The facts giving rise to the complaint are largely undisputed. The debtor was the president of V. Jobst & Sons, Inc. ("V. Jobst"), a commercial construction company operating out of Peoria, Illinois. The debtor's cousin, Paul V. Strehlow, was the treasurer of V. Jobst and the chairman of its Board of Directors. As of December of 1984, the debtor and his cousin constituted the entire Board of Directors of V. Jobst. The debtor also owned 50% of the capital stock of the Jobst Corporation, the parent corporation of V. Jobst.

To finance the various construction projects of V. Jobst and its affiliates, the Jobst Corporation borrowed several million dollars from Continental Illinois National Bank and Trust Company of Chicago ("Continental") and Commercial National Bank of Peoria ("Commercial") (collectively referred to as "the banks"). On December 21, 1982, the debtor executed a personal guarantee of any obligations of the Jobst Corporation to Continental not exceeding $5,500,000.00.

In early 1984, the Jobst Corporation began experiencing severe financial difficulties and could no longer meet the obligations on the notes it had executed in favor of the banks. During the first five months of 1984, either the debtor, his cousin, or their attorney attended a series of meetings with the banks to discuss the financial condition of the Jobst Corporation, V. Jobst and their affiliates, and the restructuring of the Jobst Corporation's obligations to the banks. As a result of these meetings, the debtor, on May 9, 1984, executed a personal guarantee of the obligations of V. Jobst and the Jobst Corporation to the banks not exceeding $7,967,358.00.

When the financial condition of the Jobst Corporation and V. Jobst continued to deteriorate, additional meetings were held between representatives of the banks, the Jobst Corporation and V. Jobst. In October of 1984, the Jobst Corporation and V. Jobst announced that they could no longer operate and the banks began liquidating the collateral which had been pledged to secure their loans to V. Jobst and the Jobst Corporation. Additionally, the banks discussed with the debtor his ability to satisfy any of the unsatisfied obligations of V. Jobst and the Jobst Corporation pursuant to the debtor's guarantee of those obligations. The debtor provided the banks with a personal financial statement dated June 30, 1984 which stated that the debtor's net worth was a negative $1,682,313.00. The debtor listed in the June 30,

1984 financial statement the debtor's personal guarantee of $7,963,493.00 in obligations to the banks. Furthermore, the June 30, 1984 financial statement revealed that within the previous year the debtor had transferred to his wife his personal residence valued at $300,000.00, as well as cash and securities valued at $125,000.00.

At a meeting in December of 1984, the debtor provided the banks with another personal financial statement dated October 31, 1984 which stated that the debtor's net worth as of that date was a negative $24,310,550.00. The debtor also listed as liabilities on the October 31, 1984 financial statement his personal guarantee of obligations of V. Jobst, the Jobst Corporation and their affiliates in the total amount of $17,119,490.00, including obligations to the banks in the amount of $7,828,767.00. At no time did the debtor dispute his liability to the banks under his guarantees. During the meeting in December of 1984, the debtor requested that the banks release him from his obligations to the banks arising from his guarantees. However, the banks refused to grant the debtor such a release. On March 18, 1985, Continental sent the debtor a letter stating that unless the debtor continued to cooperate with the banks' liquidation of the collateral securing their loans, they would "institute legal action available to them under the personal guaranties."

On that same day, March 18, 1985, Executive Life Insurance Company issued an annuity policy which listed the debtor and his wife as co-annuitants. The debtor purchased the annuity policy by transferring a single lump sum of $249,217.26 from funds which were being held for the debtor in a retirement plan maintained by V. Jobst. The retirement plan (the "Plan") was established by V. Jobst under the provisions of the V. Jobst Retirement Trust Agreement dated February 16, 1979 pursuant to the Employee Retirement Income Security Act of 1974. Under the terms of the annuity policy, the debtor and his wife are scheduled to receive payments of $8,073.56 per month beginning March 15, 1995.

The debtor's wife had little or no knowledge of the transactions or circumstances resulting in the purchase of the annuity. Since the debtor and his wife failed to timely reply to the Plaintiffs' request to admit that the debtor's wife paid no consideration for her interest in the annuity, the Court ordered that the Plaintiffs' request was deemed admitted. The Court therefore finds that, for the purposes of this adversary proceeding, the debtor's wife paid no consideration for her interest in the annuity.

The Plan provides that V. Jobst "reserves the right to amend, modify, suspend or terminate the Plan by action of its Board of Directors." Although the Plan prohibits any assignment or alienation of the participants' interests in the Plan, the Plan's participants may compel distribution of any funds held for their account in the Plan upon the discontinuance of contributions to the Plan. The Plan also provides that its provisions shall be "administered, construed and enforced according to the laws of the State of Illinois."

Commercial acted as trustee of the Plan until it resigned in December of 1984, at which time the debtor and his cousin were appointed as the Plan's co-trustees. Commercial's trust records establish that V. Jobst discontinued contributions to the Plan in early 1981. When V. Jobst ceased operating in October of 1984, the funds in the Plan were distributed to all participants in the Plan with the exception of the debtor and his cousin. Thus, as of December of 1984, the debtor and his cousin not only constituted the entire Board of Directors of V. Jobst, but they were also the sole trustees of, and participants in, the Plan.

On March 15, 1987, the debtor filed a Voluntary Petition with this Court under Chapter 7, Title 11 of the Bankruptcy Code. The debtor's schedules reflect that in the year prior to the filing of his bankruptcy petition, the debtor earned in excess of $100,000.00. The debtor currently earns in excess of $60,000.00 per year, and resides with his wife in a luxury condominium which the debtor's wife purchased free and clear of any encumbrances within six

weeks of the issuance of the annuity policy. The debtor's schedules claim the annuity policy as exempt property pursuant to § 222.14 of the Florida Statutes. As the holder by assignment of Continental's claims, FDIC objected to the debtor's claimed exemption on the ground that the debtor's purchase of the annuity was a fraudulent transfer of non-exempt property to exempt property in the form of the annuity. This Court consolidated FDIC's objection to the debtor's claimed exemption with the trustee's adversary proceeding seeking to avoid as a fraudulent conveyance the transfer to the debtor's wife of an interest in the annuity.

■ The Court finds that, but for the debtor's purchase of the annuity, the funds being held in the Plan for the debtor would have been included in the debtor's estate. 11 U.S.C. § 541 provides that all property in which a debtor has a legal or equitable interest at the time of the commencement of its bankruptcy case becomes property of its bankruptcy estate. However, 11 U.S.C. § 541(c)(2) provides that restrictions on the transfer of a beneficial interest of a debtor in a trust which are enforceable under applicable non-bankruptcy law prevent that interest from being included in the debtor's bankruptcy estate. The phrase "applicable non-bankruptcy law" in 11 U.S.C. § 541(c)(2) refers to state spendthrift trust law. *In re Lichstrahl*, 750 F.2d 1488 (11th Cir.1985); *In re DiPiazza*, 29 B.R. 916 (Bkrtcy.N.D.Ill.1983).

■ Illinois law should be applied to determine the nature of the trust according to the express terms of the Plan. The Court finds that V. Jobst's ERISA Plan does not qualify as a spendthrift trust under Illinois law. A trust is unenforceable as a spendthrift trust where the terms of the trust permit the beneficiary to exercise dominion and control over the funds in the trust. *Newcomb v. Masters*, 287 Ill. 26, 122 N.E. 85 (1919); *Von Kesler v. Scully*, 267 Ill.App. 495 (1st Dist.1932); *In re Rolfe*, 34 B.R. 159 (Bkrtcy.N.D.Ill.1983). *Cf. In re Lichstrahl*, 750 F.2d at 1490. The express provisions of the Plan entitled the debtor at his sole discretion to compel distribution of his vested funds when V. Jobst ceased making contributions to the Plan. Furthermore, since the debtor and his cousin in 1984 constituted the entire Board of Directors of V. Jobst as well as the Plan's only trustees and participants, the debtor and his cousin possessed the unfettered power to terminate, modify, amend or suspend the Plan, and thereby compel distribution of the Plan's funds. The Court concludes that because the debtor could have exercised dominion and control over the funds in the Plan, it does not qualify as a spendthrift trust under Illinois law. Therefore, the Court finds that the Plan's fund would have been included in the debtor's bankruptcy estate but for the purchase of the annuity. *In re Sundeen*, 62 B.R. 619 (Bkrtcy.C.D.Ill.1986) (plan's funds included in estate where plan provides for payment of benefits to debtor upon termination of employment); *In re Rolfe*, 34 B.R. 159 (Bkrtcy.N.D.Ill.1983) (debtor's interest in trust fund of deceased mother included in debtor's estate where debtor could withdraw trust funds at any time); *In re DiPiazza*, 29 B.R. 916 (Bkrtcy. N.D.Ill.1983) (plan's funds included in estate where debtor could withdraw his plan contributions at any time and forfeit employer's plan contributions). The same conclusion would be reached if the Court were to apply Florida law to determine whether the Plan constitutes a spendthrift trust. *In re Lichstrahl*, 750 F.2d 1488 (11th Cir. 1985); *In re Witlin*, 640 F.2d 661 (5th Cir.1981); *In re Gillett*, 46 B.R. 642 (Bkrtcy.S.D.Fla.1985).

■ The Debtor argues that the Plan's funds would have been exempt from his estate under § 12–1001(g)(5) of the Illinois Code of Civil Procedure which provides that payments a debtor receives under a pension plan are exempt "to the extent necessary for the support of the debtor and any dependent of the debtor." However, no evidence was presented by the debtor concerning his future need for the funds in the Plan. The burden of proof on the issue of necessity rests with the debtor. *In re Sundeen*, 62 B.R. 619, 621 (Bkrtcy.C.D.Ill. 1986). To the contrary, the debtor's in-

come and residence in a condominium owned free and clear of encumbrances by his wife evidence no significant need for the funds in the Plan or the additional $8,073.56 per month which the annuity would begin to provide in 1995. The debtor's income provides the debtor with sufficient opportunity to plan and save for his retirement. Additionally, even though the debtor does not hold legal title to the condominium in which he resides, Article X, Section 4 of the Constitution of the State of Florida provides the debtor with an equitable interest in the condominium such that it may not be sold, mortgaged or devised to another without his consent. The Court therefore concludes that the funds in the Plan would not have been exempt from the debtor's estate under § 12.1001(g)(5) of the Illinois Code of Civil Procedure. Moreover, the Florida exemptions law applicable at the time the debtor's petition was filed did not exempt a debtor's right to receive payments under a pension or retirement plan such as the Plan at issue here. *See, In re Lichstrahl,* 750 F.2d 1488 (11th Cir. 1985).

■ The Court further finds, under the particular facts of this case, that the debtor's purchase of the annuity with the Plan's funds had the legal effect and result of hindering, delaying or defrauding creditors as prohibited by § 726.01 of the Florida Statutes and 11 U.S.C. § 544(b). *See, In re Gefen,* 35 B.R. 368 (Bkrtcy.S.D.Fla. 1984); *In re Flanzbaum,* 10 B.R. 420 (Bkrtcy.S.D.Fla.1981). Whether a particular transfer is made to the end, purpose or intent to delay, hinder, or defraud a creditor is to be determined by the facts and circumstances of each case. *Stelle v. Dennis,* 104 Fla. 384, 140 So. 194 (1932); *Kirk v. Edinger,* 380 So.2d 1336 (Fla. 5th DCA 1980). In *In re Flanzbaum,* 10 B.R. 420, 423 (Bkrtcy.S.D.Fla.1981), this Court stated:

> [W]hen the legal effect of a conveyance is to delay, hinder or defraud creditors, no matter what the actual intention may have been, it is fraud in law and the Courts are bound to so declare.... Thus, where the result is to hinder, de-

lay, or defraud creditors, the real motive of the parties is immaterial.

The transferor's intent to hinder, delay or defraud creditors can be inferred from facts and circumstances establishing certain indicia or "badges of fraud." *United States v. Fernon,* 640 F.2d 609 (5th Cir. 1981); *In re Gefen,* 35 B.R. 368 (Bkrtcy.S. D.Fla.1984). Instances of such badges of fraud are the transferor's insolvency at the time of the transfer, the threat of litigation at the time of the transfer, and the concealment of the transfer. *Cleveland Trust Co. v. Foster,* 93 So.2d 112, 114 (Fla.1957); *Wieczoreck v. H & H Builders, Inc.,* 450 So.2d 867, 874 (Fla. 5th DCA 1984); *United States v. Fernon,* 640 F.2d 609, 613 (5th Cir.1981) (citing *Money v. Powell,* 139 So.2d 702, 704 (Fla. 2d DCA 1962)). The close relationship between the transferor and the transferee, and the transferee's lack of consideration for the transfer, are also badges of fraud from which fraudulent intent can be inferred. *Wieczoreck,* 450 So.2d at 875. In the present case, the debtor's fraudulent intent in purchasing the annuity can be inferred from the debtor's insolvency and admitted indebtedness to the banks at the time he purchased the annuity, and from his unsuccessful attempt to obtain from the banks a release on the obligations arising from his guarantees. Additionally, the debtor's prior transfers to his wife of his residence, cash and securities, as well as his transfer without consideration of an undivided one-half interest in the annuity to his wife, lead this Court to conclude that the debtor purchased the annuity with fraudulent intent.

The debtor argues that this Court's prior rulings in *In re Levine,* 40 B.R. 76 (Bkrtcy. S.D.Fla.1984) and *In re Blum,* 41 B.R. 816 (Bkrtcy.S.D.Fla.1984) should govern the disposition of this case. In both *Levine* and *Blum,* this Court stated that the mere act of converting property from non-exempt to exempt status, without more, is neither a badge of fraud nor prohibited by the Bankruptcy Code. The facts and circumstances of the instant case, however, are distinguishable from those presented in *Levine* and *Blum.* Unlike the badges of fraud present in the instant case, the plain-

tiffs in *Levine* and *Blum* were unable to prove any facts or circumstances from which the debtors' fraudulent intent could be inferred other than the mere transfers.

The Court finds that the facts of the instant case are more analogous to those present in *In re Gefen*, 35 B.R. 368 (Bkrtcy.S.D.Fla.1984), where this Court held that the debtor's pre-bankruptcy purchase of a deferred annuity contract with funds in a non-exempt individual retirement account at a time when the debtor was aware of pending litigation constituted a fraudulent transfer. *See also, In re Collins*, 19 B.R. 874 (Bkrtcy.M.D.Fla.1982) (discharge denied where debtor concealed from creditors $55,000 transfer to pay mortgage on homestead prior to bankruptcy).

The debtor argues that Continental's March 18, 1985 letter does not constitute a demand for payment under the debtor's guarantees and that without such a demand, the banks cannot challenge the debtor's purchase of the annuity policy. The Court, however, rejects this argument, as the debtor's numerous admissions of his liability to the banks under his guarantees are tantamount to the judgment held by the creditor in *Gefen*.

Lastly, the Court finds that the transfer to the debtor's wife of an undivided one-half interest in the annuity policy constitutes a fraudulent transfer under § 726.01 of the Florida Statutes. Fraudulent intent can be inferred from the close relationship between the transferor and the transferee, and the transferee's lack of consideration for the transfer. *Wieczoreck*, 450 So.2d at 875. It is established for the purposes of this adversary proceeding that the debtor's wife paid no consideration for her interest in the annuity. It was unnecessary for the trustee and FDIC to prove the debtor's wife's knowledge of any fraudulent intent in conveying to her an interest in the annuity since the debtor retained control over the annuity and his wife paid no consideration for her interest in the annuity. *In re Flanzbaum*, 10 B.R. 420, 424 (Bkrtcy.S.D. Fla.1981); *George E. Sebring Co. v. O'Rourke*, 134 So. 556 (Fla.1931).

Based on the foregoing, the Court finds that the V. Jobst ERISA Plan does not qualify as a spendthrift trust and that therefore the debtor's funds in the Plan would have been included in his bankruptcy estate but for the purchase of the annuity. Additionally, the Court finds that the funds in the Plan would not have been exempt from the debtor's bankruptcy estate. The Court also finds that the purchase of the annuity with the funds in the Plan, and the debtor's transfer to his wife of an undivided one-half interest in the annuity, are void as being fraudulent transfers prohibited by 11 U.S.C. § 544(b) and § 726.01 of the Florida Statutes. A separate Final Judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.