In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3057

IN RE: WILLIAM L. HALL,

*Debtor-Appellee.*

APPEAL OF: ENODIS CORPORATION

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 C 20—**Allen Sharp**, *Judge.*

ARGUED JANUARY 14, 2002—DECIDED SEPTEMBER 18, 2002

Before POSNER, RIPPLE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Only four months after filing for relief under Chapter 11 of the Bankruptcy Code, William L. Hall filed a motion to dismiss his petition. One of his creditors, Enodis Corporation (to which we will refer by its former name, Welbilt) believed that Hall had abused the bankruptcy process and accordingly asked the bankruptcy court to take the extra steps of making the dismissal one with prejudice and awarding monetary sanctions against Hall. The bankruptcy court promptly granted the motion to dismiss, but it reserved the right to modify the dismissal in accordance with Welbilt's motion if the facts warranted such an action. After an evidentiary hearing, the

bankruptcy court denied Welbilt's requests; the district court affirmed. Finding no abuse of discretion, we in turn affirm the decision of the district court.

## I

Consolidated Industries Corporation (Consolidated), a manufacturer and retailer of residential furnaces in Lafayette, Indiana, was once a subsidiary of Welbilt. Among the furnaces it designed and manufactured were two similar horizontal furnaces. In 1994, it became involved in costly and lengthy class action litigation over horizontal furnaces manufactured between 1982 and 1989. See *Salah v. Consolidated Indus., Inc.*, CV 738376 (hereinafter the *Salah* action). By May 1995, Consolidated's furnace design was also under investigation by the Consumer Product Safety Commission.

Many people might not want to purchase a company embroiled in so much controversy, but Hall was not one of them. In 1998, after several years of negotiation, Hall purchased Consolidated from Welbilt, becoming its sole shareholder. As a part of this purchase, Consolidated took out a loan from FINOVA Capital Corporation (FINOVA), a commercial lender, for $7.5 million, and Hall personally guaranteed the debt. Under the terms of the sale, Consolidated assumed the ultimate risk of loss on all tort litigation, although Welbilt continued its existing insurance coverage.

Approximately four months after the purchase, on May 28, 1998, Consolidated filed a Chapter 11 petition. Consolidated claimed that it could not afford the time and litigation expense of the *Salah* action. Furthermore, Consolidated was also involved in a number of other lawsuits, including one that it had filed against some 24 insurance companies concerning coverage for the defective furnaces, and one against Welbilt and associated parties claiming that Welbilt was responsible for Consolidated's debts and

that various frauds and breaches of fiduciary duty had occurred. Hall also had an individual action against the Welbilt parties. At the time of the bankruptcy filing, Consolidated's largest outstanding debt was the remaining $4.5 million due on the FINOVA note.

Before the Consolidated bankruptcy proceeding was completed, Hall filed a personal Chapter 11 petition in which he claimed that his outstanding debt was approximately $5.1 million. That number reflected Hall's direct debts as well as his exposure through his guarantee of Consolidated's debt. The petition automatically stayed all litigation against Hall (much of which had to do with Consolidated) and prevented any attempts to commence collection of debts from Hall. 11 U.S.C. § 362. The bankruptcy court scheduled a mediation designed to resolve all of the claims against Hall, but it was unsuccessful because Hall could not persuade the insurance companies to contribute to a comprehensive settlement (that also would have resolved Consolidated's bankruptcy). FINOVA then stated that it would not renew the Consolidated loan agreements, which naturally affected Consolidated's ability to secure additional loans. Without the cooperation of FINOVA and the insurance companies, Hall realized there could be no "global" reorganization of his personal assets. At that point, he filed the motion to dismiss the Chapter 11 action that led to the present dispute.

Welbilt responded by filing a cross motion to dismiss with prejudice along with a request for costs and attorneys' fees. It argued that Hall had filed his bankruptcy petition in bad faith. According to Welbilt, the record showed that Hall's personal liabilities were actually zero at the time of his filing, and so there was no basis for claiming protection under the bankruptcy laws. Furthermore, Welbilt claimed, the fraud action that Hall had filed against Welbilt prior to the bankruptcy was meritless. Welbilt also argued that Hall had filed the bankruptcy petition for the impermissible purpose of slowing down the resolution of the fraud case.

Finally, Welbilt argued that Hall had engaged in other sanctionable conduct. For instance, it alleged that Hall provided FINOVA with a false affidavit to induce it to lend him the $7.5 million; Hall committed perjury in the Consolidated bankruptcy proceeding by lying about a prior bankruptcy in 1990; and Hall committed perjury by filing a complaint in his own bankruptcy proceeding, in which he claimed that Welbilt violated the automatic stay and a bankruptcy court order. Welbilt maintained that this conduct, individually and cumulatively, amounted to an abuse of the bankruptcy process and rendered appropriate both monetary sanctions and a dismissal with prejudice.

## II

No one is claiming that Hall's personal bankruptcy petition should not have been dismissed. The only question is whether there should have been punitive elements to that dismissal, by making it with prejudice and ordering sanctions. We review the bankruptcy court's finding that Hall did not act in bad faith for clear error, *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 662 (7th Cir. 1992), and its dismissal of the bankruptcy petition for an abuse of discretion, *In re Leavitt*, 171 F.3d 1219, 1223 (9th Cir. 1999). Normally, a dismissal of a bankruptcy petition has no long-term consequences for the debtor's ability to re-file. *Umbenhauer v. Wong*, 969 F.2d 25, 30 (3d Cir. 1992). There is an exception, however, if the court "for cause" orders that the dismissal of the case is with prejudice. See 11 U.S.C. § 349(a). In that instance, the order may either bar the later dischargeability of debts that would have been dischargeable in the dismissed proceeding, or it may preclude the debtor from filing a subsequent petition related to those debts. *Id.* Dismissals with prejudice are therefore generally reserved for extreme situations, such as when a debtor conceals information from the court, violates injunctions,

files unauthorized petitions, or acts in bad faith. *Id.*; *In re Tomlin*, 105 F.3d 933, 937 (4th Cir. 1997) (filing six bankruptcy petitions in seven years)*; In re Martin-Trigona*, 35 B.R. 596, 601 (Bankr. S.D.N.Y. 1983).

Welbilt argues that Hall is exactly the kind of debtor that a dismissal with prejudice was designed for. According to Welbilt, Hall used the bankruptcy process to manipulate the course of the other lawsuits with which he and Consolidated were enmeshed, and that his bad faith was patent. Hall's sole motive for filing the Chapter 11 petition, in Welbilt's view, was to "slow down" meritless litigation in which he was a plaintiff. But there are some immediate problems with Welbilt's position. Much of that litigation involved Consolidated or Hall as a plaintiff, and the automatic stay of 11 U.S.C. § 362 does not apply to suits by the debtor. See *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)*; Martin-Trigona v. Champion Fed. Sav. & Loan & Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989). On the other hand, "[a]ll proceedings in a single case are not lumped together for purposes of automatic stay analysis." *Maritime Elec. Co.*, 959 F.2d at 1204. Thus, while the bankruptcy filing did not automatically stay Hall's own actions, nor did Hall's personal filing have any effect on Consolidated's suits, Welbilt's counterclaim against Hall (which it was admittedly aggressively pursuing) and the *Salah* action were automatically stayed. A greater problem with Welbilt's position here is that the bankruptcy court believed Hall's explanation for his course of action. Hall repeatedly testified that he filed the bankruptcy petition in an attempt to achieve a "global settlement." That is a common motive for debtors, not one that immediately raises concerns about bad faith.

Hall was attempting to gather before one court parties that represented both his and Consolidated's liabilities (as to which he definitely had a personal stake stemming from his guarantee) as well as their potential assets, permitting

a discussion among parties whose claims were interrelated. The starkest example of the entanglement between Hall and Consolidated's financial success was that Consolidated's largest liability, the remaining $4.5 million debt to FINOVA, was personally guaranteed by Hall. While it is true that a debtor does not have to file bankruptcy to negotiate with creditors, as Hall explained at argument, the global settlement was merely the method he was trying to use to achieve a critical purpose—settling the FINOVA debt. Undoubtedly Hall hoped that one of his potential assets at the settlement table, Consolidated's claim against the insurance companies, or even the claims against Welbilt, could help in resolving that debt.

We do not find this strategy so far out-of-bounds that the bankruptcy court was required as a matter of law to label it as bad faith. To the contrary, Chapter 11 is normally used to restructure or achieve a financial settlement with creditors and potential creditors. Although Welbilt may have been frustrated by this tactic, particularly considering that the global settlement failed, there is no evidence that Hall used the settlement to frustrate creditors or even that it failed because of Hall; both parties maintain that the settlement failed when the insurance companies refused to contribute any funding for the settlement. *Cf. In re Martin-Trigona*, 35 B.R. 596, 602 (dismissed with prejudice after, among other things, the debtor refused to cooperate in meeting with creditors). Once it became clear that there would be no settlement, Hall immediately dismissed his Chapter 11 proceeding, further supporting his contention that the purpose for filing the petition was to reach a settlement rather than prolong meritless litigation. On this record, we do not believe the district court clearly erred in finding Hall did not act in bad faith.

Welbilt also claims that Hall's action was meritless because he was not a true debtor, and instead was a millionaire with potential assets of $7 million, largely based on

Hall's fraud claim against Welbilt, and liabilities of only $5.1 million. In fact, Welbilt insists that Hall was not actually insolvent, relying on *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d at 660. In *Covey*, this court posed the following question for courts when defining insolvency in the bankruptcy code: "What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?" Because Hall paid over $7 million for Consolidated approximately four months prior to filing Consolidated's Chapter 11 petition, Welbilt maintains that neither Consolidated nor Hall by definition may be insolvent. Welbilt is over-reading *Covey*. *Covey* does not stand for the proposition that as a matter of law companies that command a positive sum on the market are always and forever solvent. Four months *after* Hall purchased it, Hall caused it to file its own Chapter 11 proceedings, indicating either that Hall had sorely misjudged the company when he bought it, or that Consolidated had suffered a terrible four months. Nothing in *Covey* holds that Consolidated, or Hall for that matter, could not have had a negative net worth in those circumstances.

Furthermore, contrary to Welbilt's assertion that Hall was really rolling in money when he filed his personal bankruptcy petition, the record can support the opposite conclusion. At the time Hall filed, he faced $4.5 million in contingent liabilities, the payment of which depended on Consolidated's successful resolution of its own Chapter 11 case. Hall's personal worth was intimately tied up with Consolidated's fortunes, and both looked grim.

This case also differs from *Covey* in that the liabilities as well as the assets are contingent and both must be discounted accordingly. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). We are not saying that legal claims are not assets, see *In re Polis*, 217 F.3d 899, 903 (7th Cir. 2000), only that they are contingent assets whose value must be assessed in light of the probability that they will

be realized. Even if the Welbilt actions were pending, there would still only be a possibility that Hall would have emerged victorious in the lawsuit and received a $7 million award. Indeed, Welbilt maintained throughout its brief that the fraud actions Consolidated and Hall commenced against it were entirely without merit. Presumably this means that Welbilt places the value of the plaintiffs' "assets" in the lawsuit near zero.

Suppose, however, that Welbilt believed that Hall had even a 10 percent probability of success. In that case, we would discount the $7 million by 90 percent. The value of the contingent asset would then be $700,000—the total claim times the probability that it could occur. If Hall's assets could be as little as $700,000 or even zero, then it is possible (indeed, likely) that his potential liabilities would ultimately outweigh his assets. Moreover, as we already noted, the $7 million purchase price reflected only the market value of Consolidated at the time of Hall's purchase, not what it was worth later on, when Hall filed his bankruptcy petition. In today's world, it should go without saying that the value of a company can fluctuate in a short period of time—sometimes dramatically. Although we would have to discount Hall's potential liabilities as well, they might carry a smaller discount rate given that Hall had personally guaranteed a debt that was dischargeable for Consolidated because of Consolidated's bankruptcy. Of course the likelihood that Hall would not ultimately be responsible for the $4.5 million debt would increase if Consolidated reorganized and survived its financial woes.

Welbilt has one more important arrow in its quiver, however. Hall, it argued, committed perjury in one of the Welbilt cases. Specifically, Hall testified falsely in a deposition in *Consolidated v. Welbilt*, about whether he had previously filed for bankruptcy in 1990. Hall even lied about the earlier bankruptcy to FINOVA when he first secured the loan to purchase Consolidated. Such behavior, it as-

serts, is reprehensible (as well as illegal) and cries out for severe sanctions. Neither the bankruptcy court nor the district court disagreed with the general thought that perjury is highly undesirable behavior. But the question is whether those courts abused their discretion when they refused to give the particular remedies that Welbilt was seeking here. Although they certainly might have come to the opposite conclusion, we cannot find an abuse of discretion in the decision not to grant Welbilt's motions here. Although a district court may dismiss a bankruptcy petition with prejudice because of a debtor's perjury, see 11 U.S.C. § 727(a)(4)(A), dismissal with prejudice is not invariably required. To warrant dismissal with prejudice, the false oath must be material. *In re Senese*, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000). Hall's false statements to FINOVA, or even in the Welbilt deposition, did not relate to his disclosure regarding the amount or location of his assets or liabilities in this bankruptcy. See *In re Charfoos*, 979 F.2d 390, 392 (6th Cir. 1992). Moreover, his prior bankruptcy had no bearing on his ability to file the present bankruptcy petition. Under § 727(a)(8) of the Bankruptcy Code, Hall had to wait at least six years between the petition dates. He waited even longer than that: his current bankruptcy petition was filed after almost eight years.

On this record, we cannot find that the district court abused its discretion when it refused to dismiss the petition with prejudice. The district court reasonably could have concluded that Hall's conduct, while hardly admirable, was not the sort of egregious conduct that warranted dismissal with prejudice.

### III

In light of our finding that the district court did not abuse its discretion in failing to dismiss with prejudice, we also find that it did not abuse its discretion in refusing to award

monetary sanctions covering Welbilt's attorneys' fees and costs. Although a district court is authorized to sanction a party by requiring her to pay costs and attorneys' fees, *In re Volpert*, 110 F.3d 494, 499-500 (7th Cir. 1997), it is not required to award them if it determines the party did not abuse the bankruptcy process. That is what the court decided here. It was therefore entitled to refuse Welbilt's demand for monetary sanctions.

We AFFIRM the decision of the district court.

A true Copy:

      Teste:

                            _____

                            *Clerk of the United States Court of Appeals for the Seventh Circuit*