In re WALLACE'S BOOKSTORES,
INC., et al., Debtors.

Bernard Katz, Liquidating Supervisor
for Wallace's Bookstores, Inc., et
al., Plaintiff,

v.

L. Rogers Wells, Defendant.

Bankruptcy No. 01–50545.
Adversary No. 02–5414.

United States Bankruptcy Court,
E.D. Kentucky,
Lexington Division.

March 31, 2004.

Frank T. Becker, Lexington, KY, for plaintiff.

Tracey N. Wise, Lexington, KY, for defendant.

### MEMORANDUM OPINION

#### I. Introduction

Bernard Katz, as liquidating supervisor (the "Plaintiff") for Wallace's Bookstores, Inc. ("WBI"), and affiliated debtors is before the court on the Motion for Summary Judgment that he filed on March 10, 2003. In addition, the Plaintiff is before the court on the Motion to Exclude Testimony of Defendant's Experts Under Fed.R.Evid. 702 that he filed on November 13, 2003, and L. Rogers Wells (the "Defendant") is before the court on the Motion to Exclude Testimony of Plaintiff's Expert Under Fed.R.Evid. 702 and Notice of Hearing that he filed on November 21, 2003. The trustee seeks summary judgment on Count I of the complaint initiating this adversary proceeding, avoiding three payments by WBI to the Defendant as preferential transfers.[1] Having considered the motions

---

1. The Plaintiff has indicated that he would not pursue Counts II and III of his complaint in the event that he obtains judgment on Count I. Indeed, because the preference claim requires a transfer on account of an antecedent debt and Counts II and III assert that there

and the affidavits, deposition transcripts, and other papers submitted in support thereof, and the briefs and arguments of counsel, the court finds that Count I does not present any genuine issues of material fact and that the Plaintiff is entitled to judgment on that claim as a matter of law. The court will grant the Plaintiff's motion to exclude the testimony of the Defendant's expert witnesses, and will overrule as moot the Defendant's motion to exclude the testimony of the Plaintiff's expert witness.

## II. Factual Background

It is undisputed that, on July 5, 2000, the Defendant lent $3 million to WBI's principal, Wallace G. Wilkinson. On August 29, 2000, the Defendant lent $5 million to WBI, $3 million of which satisfied the preexisting $3 million debt and $2 million of which was "new money." The debt was purportedly incurred for "bookstore purposes" (refurbishing bookstores and/or buying books). There is no dispute that these are the only loan transactions between the Defendant and WBI. The obligations to repay the loans were evidenced by two promissory notes: the first was in the amount of $3 million and was payable with $450,000 interest by November 30, 2000, with a three-day grace period; the second was in the amount of $2 million and was payable with $200,000 interest by December 31, 2000, also with a three-day grace period.

The loans were repaid, with interest, in three payments: (1) $3,450,000 was remitted in satisfaction of the $3 million promissory note on December 1, 2000; (2) $1,200,000 was remitted in reduction of the $2 million promissory note on January 16, 2001; and (3) $1,000,000 was remitted in satisfaction of the $2 million note on January 22, 2001. All three payments were made by wire transfer. WBI issued unaudited, internal balance sheets showing (a) a positive net worth of $129,588,000 as of November 30, 2000; (b) a positive net worth of $14,409,000 as of December 31, 2000; and (c) a negative net worth of $13,000 as of January 31, 2001.

## III. Legal Discussion

### A. Introduction

Count I of the complaint seeks the avoidance and recovery of the three wire transfers as preferential transfers. Preference avoidance is governed by § 547 of the Bankruptcy Code, Subsection (b) of which contains the elements of the plaintiff's *prima facie* case:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days and one year before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

was no consideration for the transfers, a judgment for the Plaintiff on Count I would preclude judgment in his favor on the other two counts.

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Defendant's answer admits all of these elements except the third, but has asserted the "ordinary course of business" exception to preference avoidance set forth in Subsection (c)(2) of the statute. Accordingly, the court must first determine if WBI was insolvent at the times of the transfers.

## B. Insolvency

### 1. The Presumption

There is no dispute that all of the elements of an avoidable preferential transfer are satisfied here with the exception of the requirement that the transfers have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3). The Plaintiff is aided in that regard by a presumption that WBI was "insolvent on and during the 90 days immediately preceding the date of the filing of the petition." *Id.* § 547(f). The payments in question were effected by wire transfer on December 1, 2000, January 16, 2001, and January 22, 2001, and WBI's bankruptcy petition was filed on February 28, 2001. Accordingly, the presumption is applicable.

■ Rule 301 of the Federal Rules of Evidence prescribes the effect of a presumption in federal courts: [2]

In all civil actions and proceedings not otherwise provided for by an Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward

with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Thus, "[o]nce the transferee comes forward with substantial evidence of solvency, the presumption vanishes and the plaintiff must come forward with sufficient evidence in order to meets [*sic* ] its burden of proving insolvency." *Oakes v. Spalding (In re Oakes)*, 7 F.3d 234 (Table), 1993 WL 339725, at *2 (6th Cir. Sep.3, 1993) (quoting *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 277 (9th Cir. BAP 1989)).

### 2. Rebutting the Presumption: Financial Statements

■ The Defendant correctly notes that the Eighth Circuit has held that "[a] financial statement showing positive net worth is sufficient to rebut the presumption of insolvency." *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir.1996) (citing *Chaitman v. Paisano Auto. Liquids, Inc. (In re Almarc Mfg., Inc.)*, 60 B.R. 584, 586 (Bankr.N.D.Ill. 1986)); *accord, W. Trimming Corp. v. Craftmart, Inc. (In re Craftmart, Inc.)*, No. C–93–4174–DLJ, 1994 WL 118274, at *2 (N.D.Cal. Mar. 10, 1994); *Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A., Ltd. (In re Payless Cashways), Inc.*, 290 B.R. 689, 698 n. 10 (Bankr. W.D.Mo.2003); *DOLA Int'l Corp. v. Bordlemay (In re DOLA Int'l Corp.)*, 88 B.R. 950, 956–57 (Bankr.D.Minn.1988). However, other courts have held that financial statements—particularly unaudited ones—do not rebut the presumption, because such statements do not reflect the "fair

---

**2.** The Federal Rules of Evidence apply in bankruptcy courts. Fed.R.Evid. 1101; Fed. R. Bankr.P. 9017.

valuation" of assets and do not include contingent liabilities. *E.g., Devan v. CIT Group/Commercial Servs., Inc. (In re Merry–Go–Round Enters., Inc.),* 229 B.R. 337, 342 (Bankr.D.Md.1999); *Mosier v. Ever–Fresh Foods Co. (In re IRFM, Inc.),* 144 B.R. 886, 889 (Bankr.C.D.Cal.1992); *see Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 547 (Bankr.D.Del.2002); *Maloney–Crawford, Inc. v. Huntco Steel, Inc. (In re Maloney–Crawford, Inc.),* 144 B.R. 531, 534 (Bankr. N.D.Okla.1992).

The Defendant has submitted an internal, unaudited financial statement indicating that WBI was solvent to the extent of nearly $130 million the day before the first of the three transfers sought to be avoided. However, another balance sheet showed that the solvency had—dropped by more than 90%—to about $14.4 million—by the end of the month in which the first transfer was made, which was two weeks before the second transfer and three weeks before the third transfer. In addition, a third balance sheet showed that WBI was *in* solvent to the extent of $13,000 within two weeks after the second transfer and one week after the third transfer. This downward spiral demonstrates that WBI's financial condition was questionable at best at the time the payments were made. For that reason and because of the unreliability of unaudited financial statements and the fact that the assets and liabilities listed on a financial statement may not be valued in accordance with the Bankruptcy Code's definition of "insolvency," the court finds that the financial statements offered by the Defendant are insufficient *per se* to rebut the presumption of insolvency.

### 3. Rebutting the Presumption: Expert Testimony

■ To determine whether the presumption is rebutted by the opinions of the Defendant's expert witnesses, the court must determine whether those witnesses are competent to testify under the "gatekeeper" analyses mandated by the Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert* held that Rule 702 of the Federal Rules of Evidence requires the trial judge to assure the reliability, as well as the relevance, of scientific testimony or evidence. *Kumho* extended *Daubert* to non-scientific expert testimony, requiring that, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 1175 (citations omitted).

### a. Crystal Faulkner

The Plaintiff challenges the reliability of the testimony of Crystal L. Faulkner, C.P.A., asserting that she lacks sufficient education and experience in bankruptcy or insolvency accounting. The Defendant responds that Ms. Faulkner "knows how to analyze a balance sheet." (Memo. of Def. L. Roger Wills in Opp'n to Pl.'s Mot. for Summ. J., at 17.) However, as discussed below, bankruptcy insolvency analysis is not a "balance sheet" test in the strict accounting sense, because a book value of an asset usually does not represent its "fair valuation" and because liabilities excluded from balance sheets must receive consideration in the bankruptcy context. It appears that Ms. Faulkner's lack of education and experience in bankruptcy insolvency analysis does bear on the reliability of her opinions.

■ The Plaintiff questions Ms. Faulkner's decision to use the asset values carried on WBI's books. Specifically, the Plaintiff focuses on the inclusion of a $60 million shareholder receivable, $7.7 million in goodwill, and "going concern" values for inventories. As the Fifth Circuit has noted:

> Needless to say, a fair valuation may not be equivalent to the values assigned on a balance sheet. Financial Statements reflect the book value of assets, ordinarily the cost of the property reduced by accumulated depreciation. The rate of depreciation is usually the maximum allowed by income tax regulations. The fair value of property is not determined by asking how fast or by how much it has been depreciated on the corporate books, but by "estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions."

*Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir.1994); *accord, e.g., Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 660 (7th Cir.1992).

Ms. Faulkner's report does not reflect that she investigated the collectibility of the shareholder receivable. *See Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.)*, 168 B.R. 408, 417 (Bankr.D.Ariz. 1994); *see also Carlson v. Rose (In re Rose)*, 86 B.R. 193, 195 (Bankr.W.D.Mo. 1988) (holding that rebutting presumption of insolvency required evidence of fair valuation of accounts receivable: "Accounts receivable need not be taken at face value when circumstances cast doubt on their collectibility."). Ms. Faulkner's deposition testimony adds little to the report, indicating that her inclusion of the receivable was based largely on the fact that the shareholder had repaid previous loans. She did not, however, investigate the source of the funds used to repay the loans to determine whether the shareholder simply borrowed additional funds from WBI, effectively renewing, extending, or refinancing—rather than repaying—the loans. Ms. Faulkner conducted little or no investigation into the shareholder's financial condition at the times of the transfers.

■ Nor is Ms. Faulkner's analysis supported by evidence that WBI's goodwill had any substantial value. *See Gray v. Chace (In re Boston Publ'g Co.)*, 209 B.R. 157, 171 (Bankr.D.Mass.1997). Although going concern values may be appropriate unless the debtor was "on its deathbed" at the time of the transfer, *e.g., Wolkowitz v. American Research Corp. (In re DAK Indus., Inc.)*, 170 F.3d 1197, 1199–1200 (9th Cir.1999); *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998); *Gillman v. Scientific Research Products Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555–56 (10th Cir.1995); *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir.1990), Ms. Faulkner's report includes no analysis regarding whether WBI was, in fact, a going concern at the time the payments were made. In fact, during her deposition, Ms. Faulkner acknowledged that she did not investigate whether WBI was able to meet its current obligations in November 2000, and merely accepted WBI's values for inventory and goodwill without independent testing. Her report's conclusory statement that she included goodwill and the shareholder receivable to "correct the errors and appropriately reflect the property shareholder receivable, goodwill, equity and common stock balances" is insufficient.

■ The Plaintiff also questions Ms. Faulkner's omission of a $105 million liability on a corporate guaranty of a third party debt. Contingent liabilities cannot be ignored in the insolvency analysis under

§ 547(b)(3). *E.g., Trans World Airlines, Inc.,* 134 F.3d at 197. As a panel of the Sixth Circuit has explained:

> Although contingent liabilities are included in determining whether a debtor is insolvent for preference purposes, they cannot be included at face value. To include contingent liabilities at full value would often render an entity insolvent as of the date the obligations were assumed, which would cause an "absurd" result. Instead, the "liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." "To determine a contingent liability, one must discount it by the probability that the contingency will occur and the liability will become real." To determine the value of a contingent liability, the court should multiply the total debt guaranteed by the probability that the debtor will be required to fulfill the guarantee. Contingent liabilities are uncertain and frequently never become actual liabilities.

*Oakes v. Spalding (In re Oakes),* 7 F.3d 234 (Table), 1993 WL 339725, at *3 (6th Cir.1993) (citations omitted). Ms. Faulkner's report does not include any data, assumptions, or analysis supporting her exclusion of the entire guaranty obligation from WBI's liabilities. Again, her deposition testimony adds little, indicating that she assumed that WBI would not be called on to pay the debts because it had not been called on to pay earlier guaranteed debts. She did not, however, investigate to determine whether the earlier debts had been repaid or simply refinanced. Ms. Faulkner, again, did not investigate the third party's solvency so she could not determine the probability that WBI would be required to fulfill the guaranties.

The court concludes that the Defendant has not provided sufficient evidence of the reliability of Ms. Faulkner's testimony to pass the *Daubert/Kumho* "gatekeeper" test. The factual basis for her opinion is not "merely weak," but is so speculative that it cannot be said to be supported by "good grounds." *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800–01 (6th Cir. 2000). Accordingly, Ms. Faulkner's report must be excluded and does not, therefore, rebut the presumption of insolvency in this case.

### b. James Knoblett

James A. Knoblett, Ph.D., C.P.A., likewise has no education or experience in insolvency or bankruptcy accounting. His report is even more conclusory and contains even less explanation than Ms. Faulkner's report, and his deposition testimony is even more damning. For example, Dr. Knoblett testified that he is aware of no difference in the treatment of contingent liabilities under the Bankruptcy Code vis-á-vis under generally accepted accounting principles. He also accepted WBI's valuation of an account receivable owed by a related party, without investigating to determine the collectibility the receivable (or even determining the identity of the related party to evaluate whether the receivable should be included in a consolidated balance sheet at all).

In addition, Dr. Knoblett did not investigate Mr. Wilkinson's solvency but based his conclusions regarding the values of the receivable owed by Mr. Wilkinson and of the liability represented by WBI's guaranty of indebtedness owed by Mr. Wilkinson solely on information indicating that he had historically paid his debts; Dr. Knoblett also acknowledged having no information regarding the source of the funds used to pay debts to WBI, so he could not confirm that the debts were paid rather than refinanced. Also, in deciding that there was a zero probability that WBI

would be called upon to honor its guaranties of Mr. Wilkinson's debts, Dr. Knoblett gave no consideration to whether the debts were in fact called around the times of the transfers.

Thus, the court likewise concludes that the Defendant has not provided sufficient evidence of the reliability of Dr. Knoblett's testimony to pass the *Daubert/Kumho* "gatekeeper" test. Accordingly, Dr. Knoblett's report must be excluded and does not, therefore, rebut the presumption of insolvency in this case.

### 4. Summary

WBI's financial statements are not *per se* sufficient to rebut the statutory presumption of insolvency, and the only other evidence that the Defendant has offered in that regard is the opinion testimony of Ms. Faulkner and Dr. Knoblett, which the court will exclude from evidence in accordance with its obligation to act as the "gatekeeper" to assure the reliability of expert testimony. The court concludes, therefore, that the presumption is sufficient as a matter of law to establish WBI's insolvency at the times of the transfers.[3] For that reason and because there is no genuine issue regarding any of the other elements of preference avoidance, the Plaintiff is entitled to judgment on Count I of his complaint unless a genuine issue remains regarding the "ordinary course" exception to preference avoidance.

### C. Ordinary Course of Business

### 1. Introduction

■ Section 547(c)(2) of the Bankruptcy Code provides:

The trustee may not avoid under this section a transfer ... to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The defendant has the burden of proving all three elements of this exception to preference avoidance. 11 U.S.C. § 547(g). "When a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing "that there is an absence of evidence to support [an essential element of] the [non-moving party's] case." ' " *Fed. Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54–55 (2d Cir. 1994) (citations omitted). Conversely, "[w]hen relying on an affirmative defense, a defendant who is faced with a summary judgment motion has the same burden as a plaintiff against whom a defendant seeks summary judgment. That burden requires that the non-moving party with the burden of proof on the issue in question produce sufficient evidence upon which a jury could return a verdict favorable to the nonmoving party." *Lawyers Title Ins. Corp. v. United Am. Bank,* 21 F.Supp.2d 785, 790 (W.D.Tenn.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *accord, e.g., Adcox v. Teledyne, Inc.,* 810 F.Supp. 909, 914 (N.D.Ohio 1992), *aff'd,* 21 F.3d 1381 (6th Cir.1994).

---

**3.** Because the presumption satisfies the Plaintiff's burden of proving insolvency, the court need not address the Defendant's motion to exclude the testimony of the Plaintiff's expert witness on the "insolvency" issue.

■ "The Bankruptcy Code does not define 'ordinary course of business' or 'ordinary business terms.' However, subsequent case law is in agreement that this section was intended to 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.'" *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989) (citations omitted). "The primary purpose of the ordinary course of business exception 'is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Grogan v. Liberty Nat'l Life Ins. Co. (In re Advance Glove Mfg. Co.)*, 761 F.2d 249, 251 (6th Cir.1985) (citation omitted). The Sixth Circuit has "repeatedly urged bankruptcy courts to consider several factors in reaching a decision on the ordinary course question. These factors include the history of the parties' dealings with each other, timing, amount at issue, and the circumstances of the transaction. Generally, the entire course of dealing is considered." *Brown v. Shell Canada Ltd. (In re Tenn. Chem. Co.)*, 112 F.3d 234, 237 (6th Cir. 1997) (citing *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989)).

### 2. Debt Incurred in Ordinary Course

■ The Plaintiff contends that the debts on account of which the payments were made could not have been incurred in the ordinary course of business or financial affairs between WBI and the Defendant because these were the only loans that the Defendant made to WBI. Yet, the Sixth Circuit has held that "a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer. This rule holds where the transaction would not be out of the ordinary for a person in the borrower's position." *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir.1990); *accord, Fulghum Constr. Corp.*, 872 F.2d at 743. Indeed, this court has itself rejected "the proposition that § 547(c)(2) does not apply to isolated, single transactions." *Official Comm. of Unsecured Creditors v. Charleston Forge, Inc. (In re Russell Cave Co.)*, 259 B.R. 879, 883 (Bankr.E.D.Ky.2001) (citing *Finn*).

■ While there may be evidence that the loans were made in the ordinary course of the Defendant's financial affairs, there is no evidence that they were incurred in the ordinary course of WBI's business. The affidavit of WBI's Vice President of Cash Management indicates that WBI had a need for cash to purchase inventory in the winter months, but these loans were made in the summer. The affidavit also indicates that WBI had a need for cash due to its expansion, but says nothing about whether borrowings similar to the loans from the Defendant were normal for WBI. The affidavit of Mr. Wilkinson's Executive Assistant may be interpreted as stating that loans similar to those from the Defendant were within the ordinary course of Mr. Wilkinson's financial affairs, but says nothing about the ordinary course of WBI's business. It may have been usual for WBI to need cash and for Mr. Wilkinson to borrow to supply that cash to WBI, but there is no evidence that it was usual for WBI to incur debts similar to those in question here.

James H. Dennedy, an investment advisor, prepared a report containing the conclusory statement that "WBI, and companies like WBI, frequently use short term, unsecured, high-interest debt to finance temporary or cyclical fluctuations in their

cash requirements. WBI relied on this type of financing to fund the periodic, short term cash needs of the business." That conclusion is not supported by evidence that *either* WBI *or* "companies like WBI" frequently incur such debt, so is inherently unreliable. These statements must be excluded under *Daubert* and *Kumho*, discussed above. Accordingly, there is no competent evidence in the record regarding whether the loans from the Defendant to WBI would be "out of the ordinary for a person in the borrower's position."

The Plaintiff also contends that the debts were not incurred in the ordinary course of business because of the size of the loans, that they were short-term loans, and that the interest rates charged were high. Mr. Dennedy's report concludes that the terms of the loans were not unusual for "high yield, short term debt." This conclusion is, of course, circular: by definition, those incurring "high yield, short term debt" agree to short terms and high interest rates. The report includes no information indicating that it was the ordinary course of WBI's business to incur "high yield, short term debt" (even if it was ordinary for the Defendant to make loans on that basis). Mr. Dennedy's report must be excluded in this regard.

Timothy Schigel, who heads a venture capital firm, reached the same conclusion. While that conclusion is somewhat more reliable in that it is supported by re-

search,[4] the conclusion is irrelevant: it does not matter whether the terms of the loans from the Defendant were consistent with those in the marketplace vis-á-vis large, short-term loans when there is no evidence that such borrowings were within WBI's ordinary course of business. While Mr. Schigel's report may not fail the "gatekeeper" test required by the Supreme Court's decisions in *Daubert* and *Kumho*, it does not satisfy the Defendant's burden of showing that his loans to WBI fell within the ordinary course of business or financial affairs of both parties.

### 3. *Payment Made in Ordinary Course*

 The Defendant must also prove that the payments were made in the ordinary course of business or financial affairs of both parties. It has been held that payments by wire transfer do not satisfy this element of the exception unless the parties normally made and received payments by wire transfer, *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728 (Bankr.W.D.Va.1995); *Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.)*, 159 B.R. 501, 509 (Bankr. E.D.Tenn.1993), *aff'd in part & rev'd in part*, 112 F.3d 234 (6th Cir.1997); *Cullen v. TDK Elecs. Corp. (In re Antinarelli Enters., Inc.)*, 76 B.R. 247, 251 (Bankr. D.Mass.1987), but the Defendant has of-

**4.** Mr. Dennedy supported his conclusion with only two examples of "high yield, short term debt." Mr. Schigel reviewed 350 transactions, but does not describe how he selected those transactions, i.e., what category of lending is represented by the transactions reviewed. The category is apparently not all loans made by Mr. Schigel's company, in that he indicates that his company was involved in nearly 400 transactions; nor does the category of transactions reviewed appear to consist of short-term debt, because Mr. Schigel states that only 37% of the transactions involved short-term notes. Moreover, the average amount borrowed (presumably the average amount of the short-term loans) was $600,000, while the amounts of the loans in question in this proceeding were $3 million and $2 million. Of the specific examples given, the amounts of the first and fourth differ considerably from these loans and Mr. Schigel does not state the term of the second or fourth loan.

fered no evidence that WBI commonly repaid loans by this method.

In addition, the Defendant acknowledges that the second and third payments were made two and three weeks late, respectively. While the technical due date of a payment may be extended by a course of dealing, the contractual deadline controls for § 547(c)(2)(B) purposes in the absence of such a course of dealing:

The bankruptcy court ... admitted that a long history of dealing between parties could counteract the literal terms of a contract, but determined that, as a result of the short business relationship between these parties, their course of dealing was insufficient to compensate for the clear terms of the contract.

The district court, in affirming, noted that the bankruptcy court had properly relied on the written terms of the contract: If the parties had engaged in a long-term credit account relationship with the debtor making comparable payments throughout, the bankruptcy court might have concluded that such payments were "ordinary" notwithstanding the written credit terms. Because in this case, the parties' relationship was less than six months and the two payments were greater than any prior payments received, the bankruptcy court properly relied on the parties' written credit agreement.

To this point in their analysis, the lower courts correctly analyzed the status of the preferential payments between FHO and Basic. Unfortunately, both fell prey to Basic's erroneous argument that absent a long course of business between the parties, a court should look to industry standards to determine whether a given payment is ordinary. This argument fails because, as noted above, § 547(c)(2) is clearly framed in the conjunctive. Congress intended that an ordinary payment be *both* ordinary between those particular parties *and* ordinary in the industry as a whole. Under Basic's argument, parties operating pursuant to an ambiguous contract and a short credit history would be able to skip the subjective analysis of § 547(c)(2)(B) and proceed directly to the objective analysis of § 547(c)(2)(C). Thus, their allegedly excepted payments would be subject to a lesser degree of scrutiny than those between parties with an established course of business dealings. The court refuses to support such a result.

*Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244–45 (6th Cir.1992). Likewise, the lending relationship between WBI and the Defendant existed only six months and, here, the three payments sought to be avoided were the only loan payments ever made by WBI to the Defendant. While Mr. Schigel expressed an opinion that a portion (some portion of 25% of 37%) of the (unspecified) loan transactions he reviewed involved late payments, even if he could render a qualified opinion as to the ordinariness of late payments in the industry as a whole, that opinion would be irrelevant under § 547(c)(2)(B). Because two of the payments in question were made after they were due under the terms of the pertinent promissory note, those payments are outside the scope of this exception as a matter of law.

### 4. Payment According to Ordinary Business Terms

While Paragraphs (A) and (B) of § 547(c)(2) are subjective components, Paragraph (C) imposes an objective test. *Fred Hawes Org., Inc.*, 957 F.2d at 243–44. "The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in

the relevant industry." *Id.* at 244 (citation omitted). The entire industry must be considered, not just the defendant's dealings with its customers. *Id.* at 245–46. In this circuit, " 'ordinary business terms' means that the transaction was not so unusual as to render it an aberration in the relevant industry." *Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 818 (6th Cir.1996). The transfers need not be consistent with a majority or even a significant percentage of the industry's transactions. *Id.* The longer the relationship between the parties the greater the permitted variance from the industry norm. *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1049 (4th Cir.1994) (citing *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217 (3d Cir.1994)).

▇▇▇ The "relevant industry" means "firms similar in some general way to the creditor in question." *Miller v. Florida Mining & Materials (In re A.W. & Associates, Inc.)*, 136 F.3d 1439, 1443 (11th Cir. 1998) (citing *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032–33 (7th Cir.1993)); *Advo–System, Inc.*, 37 F.3d at 1048, 1049 (citing *Tolona Pizza Products*). The Fifth Circuit has held that, "for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 369 (5th Cir.2002). The question is what are the normal credit terms for suppliers (or lenders) to which the debtor might reasonably turn for its needs. *Id.*

▇▇▇ The court has previously rejected Mr. Dennedy's report as so lacking in factual support as to render his conclusions unreliable. Mr. Schigel concludes (although somewhat speculatively) that it would be reasonable for WBI to obtain what he calls "sub-debt capital" to fund its growth and meet its short-term needs, particularly in light of its apparent lack of available collateral. Accordingly, his report may present a genuine issue of fact that sub-debt lending is the "relevant industry" in this case. In addition, his report indicates that 25% of the short-term sub-debt loans that he reviewed and that were paid or converted to equity were "past the maturity date" at the time of payment or conversion. His report expresses the opinion, therefore, that "payment delays certainly were not aberrations." Even accepting that opinion, however, Mr. Schigel provides no information as to *how* late payments were made, so it is impossible to determine whether the two late payments in this case were so late as to constitute aberrations in the sub-debt lending industry. In addition, the Defendant has offered no evidence to indicate that payments by wire transfer are usual in the sub-debt lending (or any other) industry. Section 547(c)(2)(C) requires the defendant to prove that the *transfer* was made according to ordinary business terms, but the Defendant in this case has offered no evidence regarding the ordinary method of repaying short-term sub-debt loans and insufficient evidence regarding the ordinary timing of payments on such loans.

### 5. Summary

The Defendant has not produced sufficient evidence upon which a jury could return a verdict in its favor based on the "ordinary course of business" exception to preference avoidance. Accordingly, the Plaintiff is entitled to summary judgment on Count I of his complaint in relation to the Defendant's affirmative defense as well as the Plaintiff's case in chief.

## IV. Conclusion

For the foregoing reasons, the court will enter a separate order sustaining the Plaintiff's motion for summary judgment, sustaining the Plaintiff's motion to exclude the testimony of the Defendant's expert witnesses,[5] and overruling as moot the Defendant's motion to exclude the testimony of the Plaintiff's expert witness. The court will also enter a separate judgment for the Plaintiff on Count I of his complaint and dismissing Counts II and III of the complaint.

---

5. The testimony of Crystal L. Faulkner, James A. Knoblett, and James H. Dennedy will be excluded on reliability grounds, and the testimony of Timothy Schigel will be excluded on relevance grounds.