In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1022, 08-1136

JOSEPH A. BALDI, *et al.*,

*Plaintiffs-Appellants*,

*v.*

SAMUEL SON & COMPANY, LTD., *et al.*,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 2990—**Rebecca R. Pallmeyer**, *Judge*.

ARGUED SEPTEMBER 24, 2008—DECIDED NOVEMBER 24, 2008

Before POSNER, WOOD, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The trustee in bankruptcy (we simplify—actually there are two trustees) of a defunct firm named Longview Aluminum LLC filed adversary actions in bankruptcy court to recover for the debtor's estate several payments that Longview had made within four years before it declared bankruptcy. The principal basis for the claims and the only one we need

discuss is 11 U.S.C. § 544(b), which allows a trustee in bankruptcy to avoid transfers made by the bankrupt that would be voidable under state law if made by an unsecured creditor. The Uniform Fraudulent Transfer Act, in force in Illinois, allows such avoidance if the debtor was insolvent on the date of the transfer and received less than a reasonably equivalent value in exchange. UFTA § 5(a); 740 ILCS 160/6(a). Only the first requirement is at issue. The corresponding provision of the Bankruptcy Code, 11 U.S.C. § 548(a)(1), is materially identical except that the federal provision allowed the trustee to reach back only one year (since raised to two years) before the declaration of bankruptcy, and that was too short a period to do anything for the trustee in this case.

Insolvency is defined by both statutes as having a balance sheet on which liabilities exceed assets. 11 U.S.C. § 101(32)(A); 740 ILCS 160/3(a). The bankruptcy judge found that Longview had not been insolvent during the period, running from February 26, 2001, to April 1, 2001, in which the transfers were made; and the district judge affirmed. The trustee had tried only to show that Longview was insolvent on both the beginning and ending dates, on the assumption that if it was insolvent on both dates then probably it was insolvent on the dates of the actual transfers, which fell between those end points; there is nothing to counter this assumption, see *Haynes & Hubbard, Inc. v. Stewart*, 387 F.2d 906, 908 (5th Cir. 1967), so we accept it. This approach is called the "rule of retrojection." *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 554 (10th Cir. 1995); *Briden v. Foley*, 776

F.2d 379, 382-83 (1st Cir. 1985). The question is whether Longview was insolvent at the beginning of the transfer period.

A company named Michigan Avenue Partners, LLC (we'll call it "MAP") decided to enter the aluminum industry, and did so by acquiring among other properties the Longview aluminum manufacturing plant, jointly owned by Alcoa and Reynolds Metals, in Washington state. A subsidiary of MAP had brought an antitrust suit against Alcoa and Reynolds that had eventuated in an order forcing the divestiture of the plant—a Pyrrhic victory for antitrust, for the result of the divestiture, as we are about to see, was a reduction in the output of aluminum.

MAP paid $140 million for Longview. But it did not have to dig into its own pockets for the money. The manufacture of aluminum requires large amounts of electricity; and Longview's electricity supplier, the Bonneville Power Administration (an agency within the Department of the Interior), desperate to be able to continue serving its most necessitous customers in a period of electricity shortage, paid Longview Aluminum LLC $226 million to cease buying electricity for the next 16 months. Longview planned to use the $226 million not only to pay the purchase price of the plant but also to enable it to resume manufacturing aluminum at the end of this "curtailment" period, as the parties call it. Among the costs it would incur to resume would be some $33 million in union wage payments, and this was recorded as a liability on Longview's balance sheet

when the company was formed on February 26, 2001. The balance sheet showed assets of $248 million and liabilities of $206 million.

Longview never did resume operations. By the end of the 16-month curtailment period, falling prices for aluminum and rising prices for electricity had made the production of aluminum from the plant uneconomical. The firm declared bankruptcy. (Its plant was ultimately dismantled.) But although it is a fair guess that Longview was insolvent before the curtailment period ended, the trustee's expert—and essentially his only source of evidence—Brooks D. Myhran (a business consultant who specializes in the valuation of companies), did not attempt to determine at what point during that period Longview became insolvent. The trustee pitched his entire case on showing that Longview had been insolvent from the beginning, that is, from February 26, 2001.

Now it is very strange to suppose a start-up company bankrupt from the day of its formation. Especially this start-up. Why would experienced businessmen, which the principals of MAP were, pay $140 million for a firm that had negative value? There is no suggestion that Longview had significant liquidation value, should it never resume operations. So MAP must have thought that Longview *would* resume operations, or at least had a good enough chance of doing so to make the company worth at least $140 million. Of course many start-ups fail, but if a significant probability of failure sufficed to pronounce a start-up insolvent, how would any start-up finance its operations? Its trade creditors would fear

being trapped by sections 544 or 548 of the Bankruptcy Code when they were paid by the start-up for supplies that they had furnished it. The trustee thinks it a killer point that Longview did not have any operating income when it started up. Well, of course not; no start-up starts with an income flow.

The pitfalls of hindsight are especially acute in dealing with a start-up. As we said, start-ups often fail. When one fails, it is easy enough to find an expert who will opine that it was certain to fail from the very start. Such facile proof should rarely be accepted, and it was rightly rejected in this case.

To establish Longview's insolvency at its starting date, Myhran jacked up its liabilities from the $206 million shown on the company's balance sheet to $367 million. He did this by adding contingent liabilities, including a contingent pension liability, contingent post-retirement benefit obligations, contingent severance payments, and the penalty provision in a take-or-pay contract with Bonneville. Contingent liabilities are—contingent. "By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *In re Xonics Photochemicals, Inc.*, 841 F.2d 198, 199 (7th Cir. 1988); see, e.g., *Freeland v. Enodis Corp.*, 540 F.3d 721, 730 (7th Cir. 2008); *In re Chase & Sanborn Corp.*, 904 F.2d 588, 594 (11th Cir. 1990). Myhran treated Longview's contingent liabilities as certainties. That invalidated his expert opinion. *In re Wallace's Book-*

*stores, Inc.*, 316 B.R. 254, 260-62 (Bkrtcy. E.D. Ky. 2004); see *FDIC v. Bell*, 106 F.3d 258, 264-65 (8th Cir. 1997).

The pension liability was not Longview's liability; it was the liability of companies affiliated with Longview. It would become Longview's liability only if the affiliates defaulted on their pension obligations, and Myhran offered no estimate of the probability of such an event. The take-or-pay provision required Longview to pay some $20 million to Bonneville in the event that Longview did not reopen and therefore did not buy electricity from Bonneville after the curtailment period. Most of the other liabilities that Myhran treated as certain were similarly contingent on Longview's never resuming production. That was a risk, of course, but not a certainty; Myhran made no effort to discount the risk by the probability that it would materialize.

It is true, as explained in *Covey v. Commercial National Bank*, 960 F.2d 657, 660 (7th Cir. 1992), that discounting a contingent liability can result in overstating a debtor's net assets. That is the case when the contingency is not whether there will be liability but whether the debtor will be able to pay it. If the debtor owed a creditor $1 million, but the probability of the creditor's being able to collect the debt was only 10 percent, the creditor's claim would be worth only $100,000 but the debtor's liability, for purposes of calculating its solvency when it assumed the debt, would still be $1 million. But that is not this case. The contingency was the probability that there would *be* a liability, not that it would be uncollectible. See *In re Advanced Telecommunication*

*Network, Inc.*, 490 F.3d 1325, 1334-36 (11th Cir. 2007); *Office & Professional Employees Int'l Union v. FDIC*, 27 F.3d 598, 601-02 (D.C. Cir. 1994). "To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i), a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent." *Covey v. Commercial National Bank, supra*, 960 F.2d at 660. Longview's package of liabilities included some that might never materialize, so that to calculate the expected cost of the package Myhran would have had to estimate the probability that they would materialize.

In order to depress the appearance of Longview's solvency further, Myhran projected that electricity costs would increase (as in fact they did) and prevent the plant from resuming operations. There were of course pessimists who in February 2001 were predicting a continued rise in electricity prices, and Longview was taking a risk in guessing otherwise. But all businesses are at risk of future changes in supply or demand that cannot be predicted with any certainty; that does not make them insolvent.

We could go on whacking Myhran's evidence, but there is no need. It was radically unconvincing, as the bankruptcy judge, seconded by the district judge, found. Likewise unconvincing is the trustee's alternative ground for avoidance, which is that Longview was "undercapitalized." Undercapitalization is not a synonym for insolvency. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1069-71 (3d. Cir. 1992). By way

of an up-to-date example, suppose a bank is very heavily leveraged—that is, it has a very high ratio of borrowed money to equity. It lends out the borrowed money, and as long as the borrowers pay on time it is fine. If many of them default, however, the present value of the bank's revenues may dip below what it owes its depositors and other lenders, and if so then without an adequate equity cushion the bank will go broke. But until the defaults reach the point at which its liabilities exceed its assets, the bank will be solvent. So "undercapitalization," which should rather be termed excessive leverage, while it increases the risk of insolvency, is not insolvency and does not require separate consideration in a bankruptcy case.

This case is different from our bank hypothetical because there was not merely a risk but a certainty that there would be a period in which the firm's costs would exceed its revenues, and it needed a capital cushion to survive that period. Concretely, Longview had to have enough capital to be able to maintain the aluminum plant until the end of the curtailment period and then to reopen it and operate it until substantial revenue started flowing into its coffers. Its balance sheet indicated that it had enough capital for these purposes.

AFFIRMED.