In the
# United States Court of Appeals
### For the Seventh Circuit

_____

No. 23-2965

IN THE MATTER OF:

INTERNATIONAL SUPPLY CO.,

*Debtor*.

APPEAL OF:

CITIZENS EQUITY FIRST CREDIT UNION

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 22-cv-3066 — **Colleen R. Lawless**, *Judge*.

_____

ARGUED MARCH 27, 2024 — DECIDED JUNE 3, 2024

_____

Before EASTERBROOK, JACKSON-AKIWUMI, and LEE, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Lee Hofmann founded and controlled multiple businesses. One of them, Games Management, borrowed about $2.7 million from Citizens Equity First Credit Union (the Lender). Hofmann guaranteed payment. When Games Management did not pay, and Hofmann failed to honor his guarantee, the Lender obtained a judgment against Hofmann, who tried to hide his income and assets to

frustrate collection. In August 2013 Hofmann and the Lender settled. Hofmann made about $300,000 available to the Lender through Games Management. He also arranged for another of his companies, International Supply, to pay the Lender $1.72 million in August 2013.

By 2015 International Supply was in bankruptcy. Its assets were sold for about $10 million, and in 2016 a trustee was appointed to distribute the funds to its creditors. In September 2017 the Trustee began a preference-recovery action against the Lender, contending that International Supply was insolvent in August 2013 and had not received reasonably equivalent (indeed, any) value for the payments it made to satisfy Hofmann's personal obligation. The Trustee invoked 11 U.S.C. §544(b)(1), which allowed him to step into the shoes of a hypothetical lien creditor under state law. Illinois provides for fraudulent-conveyance actions during the four years after a transfer. 740 ILCS 160/10(b).

Bankruptcy Judge Gorman held a trial. She treated Illinois law as substantively equivalent to 11 U.S.C. §548, see *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir. 2008), and took evidence bearing on three ways of assessing solvency: the debtor's balance sheet, its cash flow, and the sufficiency of its capital to support operations.

Expert witnesses agreed that International Supply was solvent in 2013 under the balance-sheet method. The Trustee's expert testified that it was insolvent by 2014 under this method and insolvent in 2013 under both of the other methods. The Lender's expert testified that International Supply was solvent under every method in August 2013. One reason for the difference between the experts concerned the treatment of debts owed to International Supply, which was

financing its operations by borrowing, yet distributing large sums to Hofmann and booking the payments as loans rather than salary or dividends. Hofmann never repaid these "loans," which appeared on the firm's books as assets. The bankruptcy judge explained:

> Viewed in isolation, [International Supply] bore all the hallmarks of a successful company. It was operationally profitable and showed potential for significant growth. At one point it had sizeable assets compared to its debts and was able to generate sufficient cash flows to meet its demands. But that was only half of the story. Over time, [International Supply] came to be used as the personal piggy bank of its controlling shareholder Lee Hofmann. In the years leading up to the events at issue in this proceeding, Mr. Hofmann caused [International Supply] to liquidate the company's assets to fund millions of dollars in distributions to himself or others on his behalf. When there were no longer sufficient assets to continue funding the shareholder distributions, Mr. Hofmann caused [International Supply] to incur substantial amounts of debt to provide him with needed cash. What resulted was an otherwise profitable company that was no longer adequately capitalized, unable to pay its debts, and unable to meet its own operational demands without incurring additional debt that it could not pay.

> Despite its inability to meet its own obligations [International Supply] continued to funnel whatever cash it had to Mr. Hofmann to satisfy his personal obligations and endeavors. The culmination of this practice came when, despite being unable to cover $1 million of its own input costs on a multi-million-dollar contract, [International Supply] paid [the Lender] $1.72 million and incurred liability on another $300,000 loan to satisfy what were primarily Lee Hofmann's debts. And although [International Supply] was able to stay afloat for some time due to its lender's willingness to renew and extend the maturity of its existing loans on an annual basis, the company was stretched so thin by the siphoning of cash for Mr. Hofmann's benefit that it was only a matter of time before it sought relief under the Bankruptcy Code.

2022 Bankr. LEXIS 865 (Bankr. C.D. Ill. Mar. 30, 2022) at \*83–84. Judge Gorman concluded that International Supply was insolvent in August 2013, because its income, having been diverted to Hofmann, was unavailable to keep the business afloat and repay its debts. She directed the Lender to pay $1.72 million plus interest to the Trustee, who could use the money for the benefit of International Supply's creditors (of which the Lender was not one). The district court affirmed. 2023 U.S. Dist. LEXIS 160713 (C.D. Ill. Sept. 11, 2023).

Perhaps recognizing that it would be pointless to contend that the bankruptcy judge's findings on the cash-flow and adequate-capital tests are clearly erroneous, the Lender now argues that the *sole* legally permissible approach to defining solvency is the balance-sheet test. Yet this is not what the Illinois legislation says. Illinois has adopted the Uniform Fraudulent Transfer Act, and critical provisions read this way:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: …
>
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5.

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was

> made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

740 ILCS 160/6.

These texts do not support the view that only the balance sheet matters. The statute does contain some language that uses the balance sheet (see 740 ILCS 160/3(a)), but §160/3(b) adds that an entity not paying debts as they come due likewise is presumed to be insolvent. References in §160/5(a)(2) to assets being "unreasonably small" or "debts beyond [the] ability to pay as they became due" also are incompatible with an exclusive focus on balance sheets. The statutes set up multiple ways in which a business can be insolvent for the purpose of fraudulent-conveyance liability. The Lender does not point to any Illinois decision holding that only the balance sheet diagnoses insolvency—or for that matter a decision from any other jurisdiction that has adopted the Uniform Fraudulent Transfer Act. Older decisions, interpreting statutes that the Uniform Act replaced, do not control today. The bankruptcy judge was entitled to proceed as she did.

What's more, in the bankruptcy court, the Lender and its expert both used the three distinct approaches that we have mentioned. Pressed at oral argument, counsel for the Lender conceded that until its appeal to the district court it had not argued for treating the balance sheet as the exclusive

approach. That's a forfeiture. Although a court of appeals sometimes relieves a litigant of a forfeiture, we do not see a reason to do so here. The Lender's argument is disconnected from the language of the Illinois statute—and disconnected from the fact that a balance sheet can convey an unrealistic picture of a firm's finances. International Supply booked the Hofmann "loans" as assets, but, since he wasn't repaying, what value had they? An accountant discounts the value of financial assets to reflect the risk of nonpayment, but discounting is a chancy endeavor when the obligor is of uncertain ability and willingness to pay. It would be easy to assess the value of $10 million in Enron bonds at zero; it is harder to evaluate assets backed by a person such as Hofmann. The risk of error from confining attention to balance sheets justifies using other methods, too, to determine solvency.

One final subject and we are done. The Lender's appellate brief contends that the Trustee's claim is untimely because the four-year limit in 740 ILCS 160/10(b) is a statute of repose that cannot be extended via the approach this court adopted in *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 791 (7th Cir. 2009). See also *Richardson v. Preston*, 397 B.R. 168, 173–74 (B.A.P. 1st Cir. 2008); 5 *Collier on Bankruptcy* ¶546.02(1)(b). These authorities treat a §544 action as timely if the state-law period was still running when the bankruptcy began.

Depicting the Illinois law as a statute of repose outside the ambit of *Boyer* is a novel argument. It was not made in the bankruptcy court or the district court. At oral argument counsel for the Lender suggested that it is not being made as an "independent ground" for reversal but is being flagged as a subject to be raised later should we remand on other grounds. Well, we aren't remanding—and, even if we were, the period

of limitations is not a subject to be raised for the first time more than six years into litigation. A preference-recovery action is an adversary proceeding, see Fed. R. Bankr. P. 7001, and Fed. R. Civ. P. 8 applies to adversary proceedings. See Fed. R. Bankr. P. 7008. Under Rule 8(c)(1) the period of limitations is an affirmative defense that must be raised in response to the complaint. We therefore leave to the future the question whether §160/10(b) is best understood as a statute of limitations or a statute of repose—and, if the latter, how it applies in bankruptcy.

AFFIRMED